IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION

JOHN T. O'BARR,                    )
                                   )
              Plaintiff,           )
                                   )
v.                                 )        No. 3:11-CV-177
                                   )
UNITED PARCEL SERVICE, INC.,       )
                                   )
              Defendant.           )

**MEMORANDUM OPINION**

This civil action is before the court for consideration of "Defendant's Motion for Summary Judgment" [doc. 17]. Plaintiff has filed a response in opposition [doc. 50], and defendant has submitted a reply [doc. 51]. Oral argument is unnecessary, and the motion is ripe for the court's determination.

Plaintiff has filed suit for alleged violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et. seq*., for failure to accommodate his religious beliefs; 42 U.S.C. § 1981a; the Tennessee Human Rights Act ("THRA"), Tenn. Code Ann. § 4-21-101 *et. seq*.; the Tennessee Public Protection Act ("TPPA"), Tenn. Code Ann. § 50-1-304; and Tennessee common law.[1] For the reasons that follow, defendant's motion will be denied.

---

[1] In his response, plaintiff seeks to withdraw the claim brought under the TPPA and the claim for common law retaliatory discharge. Accordingly, the court will not address those claims herein and will order that they be dismissed.

# I.

*Background*

Defendant, United Parcel Service ("UPS"), is a large package delivery service that ships and delivers packages worldwide. Part of UPS's operating organization includes "hubs" that are facilities where packages are collected and sorted for delivery. A hub utilizes a conveyor belt system that moves packages to various parts of the facility for sorting and delivery. Plaintiff worked at the Knoxville, Tennessee hub as a mechanic from November 2000 to December 17, 2010. At the time plaintiff was employed, there were five mechanics who were responsible for maintaining and repairing the hub's equipment, including the conveyor belt system.

The Knoxville hub conducts four sorts each day, Monday through Friday. When the sorts are underway, the conveyor belts are in use, and maintenance cannot be performed on the conveyor system. The "downtime" between sorts, when the conveyor belts are not in operation, is the time when the mechanics perform maintenance and repair. The period between 8:00 a.m. and 11:00 a.m. is the largest block of downtime, and much of the maintenance and repair is performed at that time. While plaintiff was employed, four of the five mechanics were scheduled to be on duty during this downtime Monday through Friday.

While plaintiff was employed at the Knoxville hub, he was a member of the International Brotherhood of Teamsters (hereinafter "the Union"). A collective bargaining agreement ("CBA") between the Union and UPS was in effect that governed the terms of

2

plaintiff's employment. Mechanics, like plaintiff, bid for available work shifts based on seniority.

When plaintiff married his present wife in March 2010, he became a member of the Church of God, Worldwide Association and thereafter was baptized in the United Church of God. As a member of the Church of God, plaintiff observes the Sabbath from sundown Friday to sundown Saturday. In addition, as part of his religious beliefs he celebrates several holy days during the year. At the time plaintiff joined the Church of God, his work schedule, which he had bid on, was 9:00 a.m. to 6:00 p.m. Monday through Friday. This schedule did not present a conflict with his observance of his Sabbath.

In the fall of 2010, UPS realigned the mechanics' shifts to address what it says were significant operational concerns, since the Knoxville hub had been identified among the hubs as "most in need" of improvement in mechanical reliability. The existing work schedule in the Fall of 2010 allowed for 59 hours of downtime. Facility Engineer David Standish developed a new shift schedule that would provide 69 hours of downtime each week. According to his declaration, Standish says he developed the schedule in approximately September 2010. UPS posted the new shift schedule on October 13, 2010, to be effective October 25, 2010. As required by the CBA, the five mechanics each bid on a preferred schedule based upon seniority. Plaintiff was fourth in seniority and bid for the 4:30 p.m. to 1:30 a.m. Monday through Friday shift, which at the time he knew would conflict with the observance of his Sabbath.

3

Plaintiff testified that he first realized in August 2010 that he would have a conflict with his 9:00 a.m. to 6:00 p.m. schedule when Daylight Savings Time would change and the sunset would occur before 6:00 p.m. on Friday. Plaintiff submitted his first request for religious accommodation by a text message sent to his supervisor, Scott Langford, in which plaintiff asked to be allowed to leave early on Fridays to observe the Sabbath. Plaintiff's employment record shows that the date of this request is documented as September 8, 2010, and the date is documented in notes made by Langford contemporaneously.

Langford testified that he may have called Standish regarding plaintiff's request, but he knows he discussed it with Human Resources ("HR"). Standish did confirm that Langford called him regarding plaintiff's request. On October 5, 2010, plaintiff made a formal request on UPS forms, asking that he not be required to work past sunset on Fridays. UPS has a written religious accommodation policy that permits employees who believe they have a conflict between their religious observances and job responsibilities to request a reasonable accommodation. During the time plaintiff's request was being considered, UPS did not require him to work on Fridays.

The District HR Operations Manager, Jeff Bloedorn, received plaintiff's request, and he sent it to the operations manager for the central region in Chicago. Bloedorn met with plaintiff on October 14, 2010, to discuss his request and possible accommodations. Bloedorn had discussions with the central region as well as corporate counsel concerning the issue. Bloedorn, Standish, and corporate counsel also discussed the issue with Matthew

4

Webb, an in-house counsel for UPS who interprets the CBA and is the person management looks to for guidance concerning what UPS can or cannot do under the union contract.

Bloedorn stated in his declaration that in addressing plaintiff's request UPS considered multiple options that included realigning the mechanics' schedules that would accommodate plaintiff and provide the same operational benefits. UPS also considered transferring plaintiff to a position that did not conflict with his Sabbath observance. Bloedorn also states in his declaration that he and Standish discussed creating a Sunday schedule that would accommodate plaintiff. Standish reported to Bloedorn that a Sunday schedule would have a substantial negative impact on UPS's ability to address some reliability concerns. Bloedorn further states that he looked at available positions in the Knoxville hub as a possible transfer for the plaintiff. There were no full-time positions available, but a part-time position during the preload was available that would not have conflicted with plaintiff's Sabbath observance. The preload job was an entry-level position.

On November 4, 2010, Bloedorn informed plaintiff by a phone call that his request for religious accommodation had been denied. Again, according to Bloedorn's declaration, he explained to plaintiff UPS's consideration of an alternative schedule and that an alternate schedule as plaintiff proposed would not provide the needed additional downtime. Bloedorn states that he also told plaintiff there were no full-time positions available, but he offered plaintiff the part-time preload position that would eliminate the conflict with his Sabbath observance. Plaintiff would not accept the part-time position and

chose to stay with his existing position and shift. Bloedorn states that he informed plaintiff that UPS would expect him to complete his shift each day and the failure to do so would result in progressive discipline.

Plaintiff clocked out before the end of his scheduled shift for the seven consecutive Fridays following the denial of his request. Plaintiff was given progressive discipline for the unexcused absences that included warning letters and an intent-to-suspend letter. During the period of progressive discipline, UPS again offered plaintiff the part-time preload position, which he again turned down. Prior to Friday, December 17, 2010, UPS notified plaintiff that his continued failure to finish his scheduled shift would be treated as job abandonment and would result in his being terminated from employment. On Friday, December 17, 2010, UPS informed plaintiff that if he left his shift early his actions would be considered job abandonment. Plaintiff indicated that he understood the situation and clocked out before the end of his shift. UPS considered this job abandonment and separated plaintiff from his employment.

UPS has not replaced plaintiff, so the Knoxville hub operates with four mechanics. At his deposition, Standish testified that he did not know of any plan to replace the plaintiff. The only concern about a need to fill plaintiff's position was raised by the Teamster organization but not by UPS local managers or supervisors. In addition, subsequent to plaintiff's departure, UPS started running a Sunday shift, utilizing four mechanics.

6

II.

*Standard of Review*

UPS's motion is brought pursuant to Federal Rule of Civil Procedure 56, which governs summary judgment. Rule 56(a) sets forth the standard for governing summary judgment and provides in pertinent part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The procedure set out in Rule 56(c) requires that "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion." This can be done by citation to materials in the record, which include depositions, documents, affidavits, stipulations, and electronically stored information. Fed. R. Civ. P. 56(c)(1)(A). Rule 56(c)(1)(B) allows a party to "show[] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."

After the moving party has carried its initial burden of showing that there are no genuine issues of material fact in dispute, the burden shifts to the non-moving party to present specific facts demonstrating that there is a genuine issue for trial. *Matsushita Elec. Indus. Co., v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). "The 'mere possibility' of a factual dispute is not enough." *Mitchell v. Toledo Hosp.,* 964 F.2d 577, 582 (6th Cir. 1992) (citing *Gregg v. Allen-Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)).

7

In order to defeat the motion for summary judgment, the non-moving party must present probative evidence that supports its complaint. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986). The non-moving party's evidence is to be believed, and all justifiable inferences are to be drawn in that party's favor. *Id.* at 255. The court determines whether the evidence requires submission to a jury or whether one party must prevail as a matter of law because the issue is so one-sided. *Id.* at 251-52.

## III.

### Analysis

### Failure to Accommodate Claim
### Under Title VII and THRA[2]

"Title VII makes it unlawful for an employer to 'discharge any individual, or otherwise to discriminate against any individual with respect to his compensation , terms, conditions, or privileges of employment, because of such individual's . . . religion[.]'" *Cooper v. Oak Rubber Co.*, 15 F.3d 1375, 1378 (6th Cir. 1994) (quoting 42 U.S.C. § 2000e-

---

[2] "The analysis of claims brought pursuant to the THRA is identical to the analysis used for Title VII claims." *Bailey v. USF Holland, Inc.*, 526 F.3d 880, 885 n.1 (6th Cir. 2008) (citing *Campbell v. Fla. Steel Corp.*, 919 S.W.2d 26, 31 (Tenn. 1996)). Tennessee Courts have held that the THRA is designed to execute the policy of federal discrimination laws and to act as an extension of those laws and have applied the same standards as those applied by federal courts in addressing cases brought pursuant to Title VII. *Raines v. Shoney's, Inc.,* 909 F.Supp. 1070 (E.D. Tenn. 1995); *Stalsworth v. Dixie Cement Co.,* No. 1390, 1991 WL 51401 (Tenn. Ct. App. April 11, 1991)*; see also Bruce v. W. Auto Supply Co.,* 669 S.W.2d 95 (Tenn. Ct. App. 1984). Accordingly, the court's analysis and conclusions concerning plaintiff's claim under Title VII apply equally to plaintiff's claim under the THRA.

2(a)). The court's analysis of plaintiff's religious accommodate case begins with determining whether plaintiff has established a prima facie case of religious discrimination. *Smith v. Pyro Mining Co.*, 827 F.2d 1081, 1085 (6th Cir. 1987); *see also Virts v. Consol. Freightways Corp.*, 285 F.3d 508, 516 (6th Cir. 2002) (citing *Smith*). "To establish a *prima facie* case, a plaintiff must demonstrate that 1) he holds a sincere religious belief that conflicts with an employment requirement; 2) he has informed the employer about the conflicts; and 3) he was discharged or disciplined for failing to comply with the conflicting employment requirement." *Virts*, 285 F.3d at 516 (citing *Smith*, 827 F.2d at 1085). "Once the plaintiff has established a *prima facie* case, the burden shifts to the defendant employer to show that it could not reasonably accommodate the employee without undue hardship." *Id*. (citing *Smith*, 827 F.2d at 1085). "For the purpose of religious accommodations, '[t]o require an employer to bear more than a *de minimis* cost in order to accommodate an employee's religious beliefs is an undue hardship.'" *Tepper v. Potter*, 505 F.3d 508, 514 (6th Cir. 2007) (quoting *Cooper*, 15 F.3d at 1378). "In cases in which seniority-based systems allegedly prevent religious accommodation, courts have held that the employer is not required to violate a collective bargaining agreement to accommodate the employee." *Creusere v. Bd. of Educ. of City Sch. Dist. of City of Cincinnati*, 88 F. App'x 813, 819 (6th Cir. 2003) (citing *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 84 (1977); *Virts*, 285 F.3d at 518-19).

9

"Once an employer has offered a reasonable accommodation, it has met its duty under Title VII." *Crider v. Univ. of Tenn., Knoxville*, 492 F. App'x 609, 612 (6th Cir. 2012) (citing *McGuire v. Gen. Motors Corp.*, 956 F.2d 607, 609 (6th Cir. 1992)). Nevertheless, "[t]he reasonableness of an employer's attempt at accommodation cannot be determined in a vacuum. Instead, it must be determined on a case-by-case basis; what may be a reasonable accommodation for one employee may not be reasonable for another." *Smith*, 827 F.2d at 1085; *see also E.E.O.C. v. Arlington Transit Mix, Inc.*, 957 F.2d 219, 222 (6th Cir. 1991) ("Because it is a relative term, 'reasonableness' must be determined on a case-by-case basis."). Generally, the reasonableness of a religious accommodation is a question of fact for the jury. *Crider*, 492 F. App'x at 612 (citing *Smith*, 827 F.2d at 1085; *EEOC v. Robert Bosch Corp.*, 169 F. App'x 942, 944 (6th Cir. 2006)). "An employer only needs to make reasonable accommodations for an employee's religion. This principle does not require the employer to accommodate the employee in the way the employee finds to be the most desirable." *Creusere*, 88 F. App'x at 819.

> In analyzing a religious accommodation claim, a court must first decide whether the employer's conduct was a reasonable accommodation of the employee's religion. If the employer did not offer a reasonable accommodation, then the court must determine whether a reasonable accommodation would place an undue burden on the employer. An employer is liable under Title VII only if the accommodation of the employee's beliefs would not present an undue burden.

*Id.* at 818 (internal citations omitted).

There is no dispute regarding whether plaintiff has met the requirements of a *prima facie* case. UPS does not question the sincerity of plaintiff's beliefs as a member of the United Church of God, and the record demonstrates that he notified UPS of his religious beliefs and the conflict with his job duties. The third prong of the *prime facie* case is met since plaintiff was discharged from his employment. Thus, the court needs to look at whether UPS offered plaintiff a reasonable accommodation and whether a reasonable accommodation would create an undue burden on UPS.

## Reasonable Accommodation Offered by UPS

UPS offered plaintiff a part-time position as a preloader that would have eliminated the conflict with plaintiff's observance of the Sabbath. UPS contends that there is no dispute of fact that the accommodation was reasonable under the circumstances. Plaintiff points out that the preload position is an entry-level position that did not involve use of his mechanic's skills, meant a loss of seniority, a reduction in benefits, and a pay reduction from $30.25 per hour to $9.50 per hour.

"The focus of the inquiry as to what type of accommodation is 'reasonable' is on whether the accommodation preserves the employee's terms, conditions, and privileges of employment, once the employer has eliminated the religious conflict with the employee's requirements." *Reed v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am.*, 523 F. Supp. 2d 592, 599 (E.D. Mich. 2007) (quoting 45A Am Jur 2d *Job*

11

*Discrimination* § 133). If an accommodation results in an employee losing an employment benefit "enjoyed by all other employees who do not share the same religious conflict," the result is discriminatory. *Cooper*, 15 F.3d at 1379. Again, the reasonableness of a religious accommodation is determined on a case-by-case basis and is usually a question for the jury. *Morris v. Four Star Paving, LLC*, No. 3:12-cv-0387, 2013 WL 1681835, at *13 (M.D. Tenn. Apr. 17, 2013) (citing *Arlington Transit Mix*, 957 F.2d 219).

The court concludes that there are material issues of fact concerning whether UPS's offer to the plaintiff of a part-time position as a preloader was a reasonable accommodation under the circumstances in this case. The part-time position would have resulted in a loss of pay as well as a reduction in other benefits. Plaintiff also would not be working as a mechanic, his skilled profession, but would be in an entry-level position. Therefore, the reasonableness of this accommodation under the circumstances of this case is a question for the factfinder.

Undue Hardship

The CBA calls for schedules to be rebid two times per year. A new schedule had been rebid in August 2010, which became effective the first Monday in September. The new schedule that UPS implemented to address what it considered to be operational concerns went into effect on October 25, 2010. Under the CBA, UPS has the ability to rebid any time as dictated by business needs. Under the prior schedule, plaintiff worked 9:00 a.m. to 6:00

12

p.m. Monday through Friday and needed an accommodation to leave 30 minutes early one day per week. UPS agrees that a shift schedule can be modified by 30 minutes without rebidding it. Under the new schedule effective October 25, 2010, plaintiff's schedule was 4:30 p.m. to 1:30 a.m. Monday through Friday, so he only worked a short time before having to leave to observe his Sabbath. Plaintiff asked for an accommodation that would excuse him from working on Friday night. UPS's position is that realigning schedules, including a Sunday schedule, that met operational goals and addressed operational concerns could not be created.

Plaintiff asserts a number of factual matters which he argues call into question the implementation of the new rebid that occurred after plaintiff made his informal request for an accommodation on September 8, 2010, and his formal written request on October 5, 2010. Plaintiff argues that UPS makes a misleading argument in its brief concerning when plaintiff made his first request for accommodation. Also, plaintiff argues that while UPS contends that the new schedule was in progress the month before, in September, there are no documents to evidence the different evaluations of schedules and downtime performed by Langford and Standish. Standish testified they did not keep them. This occurred in spite of Webb's acknowledgment that the O'Barr matter "was a big deal. . . . [I]t was a big deal because you could see something else coming down the pike and that was this lawsuit."

Plaintiff also questions the "most in need" representations made by UPS concerning the Knoxville hub. Standish testified that the Knoxville hub was the worst in the

13

country in reliability. However, when shown hub ranking charts that demonstrated how many other hubs in the country in 2010 were worse than Knoxville, he agreed with what they showed. In addition, plaintiff points out that Standish testified that decisions regarding shift rebids were usually made by him in the district with his manager. However, the October 2010 rebid was discussed on a conference call with corporate although Knoxville was not on the corporate list. UPS has an "Adopt-a-Hub" program that has a formal corporate list and informal regional list. Knoxville was not on the corporate list in 2010; it went on that list in 2012 based upon 2011 performance numbers. It was on the regional list in 2011 based upon 2010 performance numbers. Thus, plaintiff questions the involvement of corporate in the specific rebid in the fall of 2010.

Further, plaintiff raises the questionable timing of the fall rebid when an new schedule was bid in August and took effect the first Monday in September. The October shift schedule that created the greatest conflict for plaintiff was put into effect after he had made his request for an accommodation. Plaintiff thus questions why UPS waited until October to address the critical "operational concerns."

Additionally, plaintiff argues that the rebid was not done properly, contending that Article 70, Section 1(E) of the CBA should have been utilized in the Fall 2010 rebid. Plaintiff contends that if that provision was used, UPS could have accommodated him. However, because the rebid was done by seniority, his religious conflict became more pronounced.

14

Section 1(E) of Article 70 states:

> If a mechanic start time is changed by more than one (1) hour, the start time will be posted for bid on the first (1st) Monday after the change and the successful bidder will start on the first (1st) work day the following week provided he/she is qualified to perform the work. There shall be two (2) moves, and the Employer will fill the second (2nd) opening.

Webb testified in his deposition regarding when this provision applies.

> . . . E involves a group of employees who have already gone through the bid for their start times and schedules. I then have a need for a new shift and schedules. I then have a need for a new shift let's just say. It's one shift. I need this position filled. The current schedule doesn't afford me the opportunities that I need to have coverage, to have work, whatever it might be. If I get this one schedule in place, this will fix my issues. I bid that.

Webb also clarified that under Article 70 there are only two moves. Plaintiff's argument that this provision allows for alternating "two step" moves with as many as four selections is not supported by the language of the provision or the testimony of the UPS attorney charged with interpreting the CBA.

In relation to the CBA, plaintiff argues that the new schedule went into effect on October 25, 2010. However, a brief delay of seven days in implementing the schedule would have placed the start date in November. UPS did not have to post bids in the November/December time period, and seniority bidding would not have been an issue had UPS waited that short period of time to implement the schedule. UPS does not respond to this argument.

15

With regard to plaintiff's suggestion that he be allowed to work on Sunday, UPS concluded that such a schedule was not feasible. Standish stated in his declaration:

> I evaluated this proposal; however, based on the scheduled operations at the Knoxville Hub, after close review, I determined that UPS could not create an alternative schedule that achieved the same operational goals and addressed UPS's operational concerns in the manner the schedule we developed that went into effect on October 25, 2010.
>
> . . .
>
> Based on my analysis, I concluded that changing the work schedule to include a Sunday shift would have a substantial, negative impact on UPS's ability to address the reliability issues we were having with the equipment in the Knoxville hub.

However, after plaintiff was terminated, UPS implemented a Sunday schedule. UPS has not replaced plaintiff, so the schedule is operating with four mechanics. One reason UPS stated for why a Sunday schedule was not workable was that plaintiff would have to work alone and two mechanics would not work on a Sunday schedule. At one point Standish testified that a typical shift has only one mechanic. Yet UPS now operates a Sunday schedule with four mechanics, when it has contended that such a schedule would not work when it had five mechanics.

Plaintiff also offers a schedule sheet showing a Saturday-Sunday schedule titled "Current 2011 Shifts - February Bid Sheet - 2011" that references "Shifts with only 4 mechanics working." The total downtime of 42 hours is less than the Fall 2010 schedule. UPS responds that the 2011 schedule for mechanics in Knoxville creates 67.5 hours of downtime and offers a document to support that position. UPS, however, does not explain

16

the shift schedule plaintiff offers, a document that was generated by UPS and produced to plaintiff in discovery. Nor does UPS address the existence of a Sunday schedule that was so unworkable when plaintiff asked for such an accommodation. It argues that the schedules implemented since plaintiff's departure continue to justify the business necessity of increased downtime. Nevertheless, the reliability of the Knoxville hub became worse in 2011 after plaintiff's departure.

   For the reasons discussed above, the court concludes that there are material issues of fact concerning the legitimacy of UPS's undue hardship defense. This is especially so in light of the implementation of a Sunday schedule after plaintiff's termination that utilizes four mechanics, because plaintiff has not been replaced. *Cf. Morris*, 2013 WL 1681835 (existence of material factual disputes regarding undue hardship defense and offer of an hourly position; "Defendant did not replace Plaintiff with another foreman and lacks any evidence of decreased profits or business. . . . Plaintiff testified that he was uncomfortable with the hourly position, but offered to work in an hourly position and the Defendant's lack of Saturday work requiring three base crews after Plaintiff left the Defendant's employment raises disputed issues about its undue hardship defense."). Accordingly, summary judgment as to plaintiff's failure to accommodate claim is inappropriate.

## Retaliation Under Title VII and THRA[3]

In order to demonstrate a *prima facie* case of retaliation under Title VII, a plaintiff must show by a preponderance of the evidence that: "1) he engaged in activity that Title VII protects; 2) defendant knew that he engaged in this protected activity; 3) the defendant subsequently took an employment action adverse to the plaintiff; and 4) a causal connection between the protected activity and the adverse employment action exists." *Abbott v. Crown Motor Co.*, 348 F.3d 537, 542 (6th Cir. 2003) (citations omitted). "With regard to the fourth element, '[t]he evidence must be sufficient to raise an inference that the protected activity was the likely reason for the adverse action.'" *Creusere*, 88 F. App'x at 820-21 (quoting *Wade v. Knoxville Utils. Bd.*, 259 F.3d 452, 463 (6th Cir. 2001)). "The burden of establishing a *prima facie* case in a retaliation action is not onerous, but one easily met." *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000). Once plaintiff has demonstrated a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for its adverse employment action. *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 315 (6th Cir. 2001). If the defendant states such a reason, the burden shifts to plaintiff to show that the given reason is really a pretext for discrimination. *Id.*

---

[3] "Retaliation claims under Title VII and the THRA are governed by the same standard." *Tolliver v. Children's Home-Chamblis Shelter*, 784 F. Supp. 2d 893, 908 (E.D. Tenn. 2011) (citing *Kessler v. Riccardi*, 363 F. App'x 350, 355 (6th Cir. 2010)); *see also Wade*, 259 F.3d at 464. Therefore, the court's analysis concerning the Title VII retaliation claim will apply equally to the THRA retaliation claim.

With regard to pretext, the Sixth Circuit has stated:

> To raise a genuine issue of material fact on the validity of an employer's explanation for an adverse job action, the plaintiff must show, again by a preponderance of the evidence, either (1) that the proffered reasons had no basis in fact; (2) that the proffered reasons did not actually motivate the action; or (3) that they were insufficient to motivate the action.

*Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 883 (6th Cir. 1996)(citations omitted); *see also Romans v. Mich. Dep't of Human Servs.*, 668 F.3d 826, 839 (6th Cir. 2012) (pursuant Sixth Circuit case law, plaintiff can show pretext in three interrelated ways: "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the action, or (3) that they were insufficient to motivate the action"); *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 n.4 (6th Cir. 2009) (the court asks "whether the plaintiff has produced evidence that casts doubt on the employer's explanation, and, if so how strong it is."). "Whichever method the plaintiff employs, he always bears the burden of producing sufficient evidence from which the jury could reasonably reject [the defendants'] explanation and infer that the defendants intentionally discriminated against him." *Clark v. Walgreen Co.*, 424 F. App'x 467, 474 (6th Cir. 2011) (internal quotation marks and citation omitted).

"Pretext is a commonsense inquiry: did the employer fire the employee for the stated reason or not? This requires a court to ask whether the plaintiff has produced evidence that casts doubt on the employer's explanation, and, if so how strong it is." *Chen*, 580 F.3d at 400 n.4. "As the Supreme Court has made clear, [the plaintiff] was required to provide not only evidence from which the finder of fact could conclude that [defendant's] proffered

reason is false, but also evidence from which the factfinder could conclude that [defendant's] action was intentionally discriminatory." *Smith v. Allstate Ins. Co.*, 195 F. App'x 389, 395 (6th Cir. 2006) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 519 (1993) ("It is not enough, in other words, to *dis*believe the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination.")). At all times, the ultimate burden of persuasion remains with the plaintiff. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

UPS argues that plaintiff's retaliation claims should be dismissed because he admits that there is no factual basis to support them. Plaintiff was asked in his deposition if he contended that UPS terminated him because he asked for a religious accommodation. He answered, "No, I contend that UPS terminated me for observing my religious beliefs." He also testified that he had a suspicion that his shift was changed because of his request for an accommodation, but he did not have supporting facts at the time of his deposition. In response to UPS's motion, plaintiff submitted a declaration in which he states:

> After my deposition, my attorneys obtained documents from UPS and took depositions of UPS managers. They obtained facts that were not known or understood by me at the time the events were occurring. Now that I am aware of the facts, my suspicion is confirmed and I believe that UPS changed my schedule to make my conflict with the Sabbath much worse and set up a situation to justify firing me because I asked for an accommodation for the Sabbath.

In his response, plaintiff presents numerous arguments in support of this contention, many of which have been included herein. In its reply, UPS makes no further argument concerning

20

the retaliation claims or the arguments and evidence offered by plaintiff in opposition to the move to summarily dismiss the retaliation claim. The court will therefore consider the burden-shifting analysis of plaintiff's retaliation claims.

It is clear from the record that plaintiff has satisfied the first three prongs of a *prime facie* case of retaliation. The fourth prong requires plaintiff to demonstrate a causal connection between his religious accommodation and his termination. "In order to demonstrate a causal connection, 'a plaintiff must produce sufficient evidence from which an inference can be drawn that the adverse action would not have been taken had the plaintiff not [engaged in the protected activity].'" *Adair v. Charter Cnty. of Wayne*, 452 F.3d 482, 490 (6th Cir. 2006) (quoting *Allen v. Mich. Dep't of Corr.*, 165 F.3d 405, 413 (6th Cir. 1999)); *see also E.E.O.C. v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997) ("[T]o establish the element of causal link a plaintiff is required to proffer evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse action. Accordingly, at the *prima facie* stage the burden is minimal, requiring the plaintiff to put forth some evidence to deduce a causal connection between the retaliatory action and the protected activity and requiring the court to draw reasonable inferences from that evidence, providing it is credible." *Avery Dennison*, 104 F.3d at 861 (internal quotation marks and citations omitted).

"Although no one factor is dispositive in establishing a causal connection, evidence . . . that the adverse action was taken shortly after the plaintiff's exercise of

21

protected rights is relevant to causation." *Nguyen*, 229 F.3d at 563. "[The Sixth Circuit has] accepted temporal proximity as a valid basis from which to draw an inference of retaliatory motivation under limited circumstances. . . . Specifically, the more time that elapses between the protected activity and the adverse employment action, the more the plaintiff must supplement his claim with other evidence of retaliatory conduct to establish causality." *Williams v. Zurz*, No. 10-4161, 2012 WL 5351270, at *4 (6th Cir. Oct. 30, 2012) (quoting *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 400 (6th Cir. 2010) (citations and internal quotation marks omitted)).

In this case, the causal connection for the retaliation claims is factually and temporally intertwined with plaintiff's religious accommodation claim. Plaintiff's religious accommodation request was denied on November 4, 2010, and at that time he was again offered the part-time preload position, which he declined and chose to stay with his existing schedule. When he clocked out to observe his Sabbath before the end of his shift, progressive discipline procedures were initiated that after several weeks resulted in plaintiff's termination for what UPS stated as job abandonment. Thus, plaintiff's termination was close in time to his exercise of protected activity. The Sixth Circuit "has found a temporal gap of only twenty-one days 'is significant enough to constitute indirect evidence of a causal connection so as to create an inference of retaliatory motive.'" *Id.* (quoting *DiCarlo v. Potter*, 358 F.3d 408, 422 (6th Cir. 2004)). "Temporal proximity can often help meet this causal burden, and where the adverse action comes 'very close in time' after the exercise of

22

protected activity, 'such temporal proximity . . . is significant enough' to meet the burden alone." *A.C. ex rel. J.C. v. Shelby Cnty. Bd. of Educ.*, 711 F.3d 687, 699 (6th Cir. 2013) (quoting *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008)). In addition, the evidence discussed above concerning the timing of the October 2010 shift change as well as the issues regarding UPS's reasons for not accommodating plaintiff at a minimum create an issue of fact as to causation, if not actually establish the required causal link.

Therefore, assuming as the court does that plaintiff has demonstrated a *prima facie* case, the burden shifts to UPS to articulate a legitimate, nondiscriminatory reason for its termination of plaintiff. The given reason is that plaintiff abandoned his job when he did not work his complete shift on December 17, 2010. The burden then shifts to plaintiff to demonstrate the reason is a pretext for discrimination.

The court concludes that there are material issues of fact concerning whether UPS's reason for terminating plaintiff is a pretext. The evidence already discussed in relation to plaintiff's religious accommodation claim, viewed in the light most favorable to the plaintiff, raises factual questions regarding whether UPS's reason for termination was intentionally discriminatory. For example, the timing of the shift rebid after plaintiff's initial request for a religious accommodation as well as the issues surrounding the Sunday schedule accommodation are interrelated with the adverse employment decision UPS eventually made. The ultimate resolution by the factfinder concerning the issues of reasonable accommodation and undue hardship impact the determination of UPS's motive in its decision to terminate the

23

plaintiff. Plaintiff has presented sufficient evidence to cast doubt on UPS's legitimate reason

for his termination. Thus, summary judgment is not appropriate as to plaintiff's retaliation

claim.


## 42 U.S.C. § 1981a

Plaintiff also asserts a claim pursuant to 42 U.S.C. § 1981a and argues that

while UPS did not address this claim specifically in its motion, it has moved to dismiss all

of plaintiff's claims. "Section 1981a permits victims of intentional discrimination to recover

compensatory and punitive damages." *Simmons v. Johnston*, No. 1:08-CV-822, 2009 WL

3153039, at *8 (W.D. Mich. Sept. 24, 2009) (citing *Burlington N. & Santa Fe Ry. Co. v.*

*White*, 548 U.S. 53, 72 (2006); *West v. Gibson*, 527 U.S. 212, 219 (1999)). However, the

"statute does not create a new substantive right or an independent cause of action; rather, it

'enhances the remedies otherwise available for intentional employment discrimination.'"

*Bennett v. Calabrian Chems. Corp.*, 324 F. Supp. 2d 815, 839 (E.D. Tex. 2004) (quoting

*Perry v. Dallas Indep. Sch. Dist.*, No. CIV. A. 3:96-CV-2855, 1998 WL 614668, at *1 n.1

(N.D. Tex. Sept. 2, 1998)); *see also Presutti v. Felton Brush, Inc.*, 927 F. Supp. 545, 550

(D.N.H. 1995) ("Implicit in § 1981a is the requisite that an action will not exist under the

Civil Rights Act absent a primary claim under another substantive act."); *Powers v.*

*Pinkerton, Inc.*, 28 F. Supp. 2d 463, 472 (N.D. Ohio 1997) ("[A] claim based on § 1981a

does not afford an independent ground for relief but is a statutory provision for additional

recovery of damages in Title VII cases."). "There is no such thing" as a § 1981a claim. *Perry*, 1998 WL 614668, at 1 n.1.

Therefore, the court does not need to separately address the viability of a "claim" based upon § 1981a. Plaintiff's entitlement to any enhanced remedies is dependent on the viability of his Title VII claims.


### Application of Missing Evidence Rule

Plaintiff argues at this stage of the proceedings that he has a good faith basis for having the missing evidence rule applied to two aspects of the evidence in this case. Plaintiff cites in support of his contention *Rogers v. T. J. Samson Community Hospital*, 276 F.3d 228 (6th Cir. 2002) and *Welsh v. United States*, 844 F.2d 1239 (6th Cir. 1988).

In his argument, plaintiff contends that the "missing evidence" is documents that although requested by plaintiff through discovery have not been provided. UPS points out that no motions to compel have been filed in this case nor has plaintiff moved for relief under Fed. R. Civ. P. 56(d).

First, the court will not at this juncture make any ruling regarding the exclusion of evidence at trial. Whether the facts in this case warrant application of the missing evidence rule is an issue that will be addressed at the time of trial if necessary. Second, to the extent plaintiff complains about evidence he did not receive through discovery, he should have utilized the avenues of relief available to him under the Rules of Civil Procedure by

filing a motion to compel or for relief under Rule 56(d). *Cf. CGH Transp., Inc. v. Quebecor World*, *Inc.*, 261 F. App'x 817, 820 (6th Cir. 2008) ("[Plaintiff] did not raise these discovery-related concerns in the district court by, for example, either bringing a motion to compel discovery or filing an affidavit pursuant to Federal Rule of Civil Procedure 56(f)."); *see also cf. Appalachian Railcar Servs., Inc. v. Boatright Enters., Inc.*, 602 F. Supp. 2d 829, 850 (W.D. Mich. 2008) ("Having failed to seek relief under Rule 56(f), [plaintiff] cannot now be heard to complain that it lacked a full record on which to show genuine issues of material fact on all its claims.").[4]  Plaintiff was granted multiple extensions of time to respond to UPS's motion for summary judgment and additional time for discovery.  The court will not entertain plaintiff's complaints about evidence he did not receive through discovery when he did not fully exhaust the remedial measures available under the Federal Rules of Civil Procedure addressing such matters.

## IV.

### *Conclusion*

Accordingly, for the reasons stated herein, "Defendant's Motion for Summary Judgment" will be denied, and this case will proceed to trial.  An order consistent with this opinion will be entered.

---

[4] Rule 56 was amended effective December 1, 2010, and the new "[s]ubdivision (d) carries forward without substantial change the provisions of former subdivision (f).  A party who seeks relief under subdivision (d) may seek an order deferring the time to respond to the summary-judgment motion."  Fed. R. Civ. P. 56 advisory committee's note.

ENTER:

_____s/ Leon Jordan_____
United States District Judge